## SUPERIOR COURT OF BALTIMORE CITY.

Filed June 6, 1908.

HATTIE CARSON RISNER
VS.
HENRY T. RENNOLDS AND MALCOLM E. DOUGLAS.

*James Fluegel* for the plaintiff.
*John L. Sanford* for the defendants.

ELLIOTT, J.—

A ruling on this prayer requires, to some degree at least, an examination of the testimony that has been offered, and a discussion of the declaration which must have the support of the testimony in this case in order to entitle the plaintiff to recover.

The case, in a few words, is this: That the two defendants here entered into a conspiracy with the husband of the plaintiff in this case, for the purpose of depriving her of her liberty by incarcerating her in an insane asylum; that the two defendants in this case, knowing that she was sane, or knowing such circumstances with regard to her that ought to have told them, as reasonable, prudent and skillful physicians, that she was sane, notwithstanding that knowledge actually possessed by them, and notwithstanding the responsibility which the law placed upon them to have that knowledge, entered into a conspiracy as between themselves and along with the husband of this plaintiff, and certified to a fact which they either knew was not true or ought to have known was not true if they had availed themselves of the opportunities which they had, and had applied to those opportunities the skill which, as physicians, the law implies they had.

Now, the testimony consists principally of the testimony of the plaintiff herself, all of which relates to occurrences before her arrest; secondly, the testimony of a physician at the Enoch-Pratt-Sheppard Asylum with regard to the condition of the plaintiff while she was in that institution; and, in the third place, of the testimony of physicians, the testimony of no one of whom clearly and definitely relates to a period of time within less than a year of the time when the two certificates were given.

Now, so far as the third class of testimony is concerned, it may, in the opinion of the court, be taken as absolutely true without in any way shedding light upon or qualifying any of the situations which existed at the time or the defendants' examination or their opportunity to examine her. There was a qualification of that, however, in the testimony of one of the doctors—Dr. Wantz, I think it was, who testified that he had had occasion to see the plaintiff in this case two or three years ago. Of course, he carried it so far back as 1905, which antedated the giving of the certificates. And the strength of that testimony was, so far as Dr. Wantz knew, or so far as he apprehended, that the plaintiff in this particular case was sane, and had never been insane. When you come down to the second class of testimony you have only one witness, as far as the court recollects, namely, Dr. Farrar, who was connected with the institution in which the plaintiff was detained. Dr. Farrar's testimony was that, from an examination made immediately after the arrest and incarceration of the plaintiff, and at intervals during the month or time she was detained in the institution, he saw no such condition or a lack of what he termed a normal condition in this plaintiff as would have justified her incarceration in the institution, and when he was asked to turn his attention particularly to the question of insanity, he said, what left the court at any rate to conclude, that there might be degrees of insanity, as there certainly might be degrees of a lack of normality, which would not justify an incarceration at all. The effect of his testimony was that so far as he could tell from the examinations which he had made, all of which had been made subsequent to the arrest and during the incarceration, the first one having been made nearly coincident with the incarceration, he had not been able to see any indication of a condition of mind which would have justified the plaintiff in this case being detained.

Now, when you come to the testimony of the plaintiff herself, that testimony is with regard to the examinations that were made of her by these two physicians previous to the time when they gave the certificates. And the evident object of that testimony was to show that these doctors who gave the certificates had not only stated something that was not true when they spoke with regard to her mental condition, but that, in addition to that, they had shut their eyes to her real condition for the purpose of entering into a combination with the plaintiff's husband with the view of detaining her in this institution and depriving her of her liberty.

Now, if there had been no other testimony than that, that might have made out a prima facie case as against the defendants, to a certain degree at least. But there is absolutely no testimony which would justify this jury, or any other reasonable men, in concluding that these two defendants had deliberately entered into a conspiracy and a combination with the husband of this plaintiff with the view of depriving her of her liberty. It may very well be that the conduct of the plaintiff's husband towards her had been reprehensible, it may very well be that he had so conducted himself towards her, and so treated her, that she should have, and does have, relief at the hands of the law as against him. But the husband is not in this case as a defendant, and the charge which we must find supported by the testimony is restricted to the action of these two physicians, and we must, therefore, ask ourselves: What is there in this case which shows, or from which this jury could draw a reasonable conclusion to the effect, that they entered into a conspiracy with the husband of the plaintiff for the purpose of depriving her of her liberty? The court answers that question, anticipated as it has been by the counsel for the plaintiff, and says: There is absolutely nothing in the case that would support that count of the declaration. Now, that being true, that being eliminated, and the skies being cleared to that extent at least,

it is only necessary for us to consider the other feature of the case.

Now, the other feature of the case, as I understand it, is this: In a situation where they had reason to believe, and every opportunity of discovering, whether or not the plaintiff was insane, and in a situation where men who had the knowledge which the law presumes they did have, would have known she was not insane, they issued these certificates to the effect that she was insane, and that her insanity was of that character and that degree which justified her detention in some institution. Now, that is the strength of the complaint, and the strength of the testimony must equal it, and must be such as would necessarily conclude the jury into believing that these two defendants did what was complained of them.

The plaintiff, in the course of the case, and under what were considered the exigencies of the situation, put one of the defendants upon the stand, and asked that defendant as to the circumstances under which his certificate had been issued. As I have already said, it must be shown that these certificates were issued by the physicians falsely and fraudulently, and issued at a time when the physicians knew the facts they were stating in them were untrue, and also knew that the effect of those untrue statements was to deprive a woman who was entitled to her liberty of that liberty. And the witness, in the course of the examination, gave facts and gave circumstances, no one of which has been contradicted, or, certainly, not all of which have been contradicted, by any testimony to the contrary offered by the plaintiff herself, which facts and circumstances the witness, Dr. Rennolds, said led him to think that the woman was insane, and was in that condition where she ought to be sent to some institution for treatment.

Now, it is not to be forgotten that the act of the physicians could have been performed by them, that both of these certificates could have been signed by these physicians, without this plaintiff ever having been detained in an institution. The certificates were simply steps in the procedure that was taken, not by the physicians, but by the husband of this plaintiff. They were not, therefore, the things which

necessarily compelled the result. They were not even the steps which were necessary to the detention of this woman, because this woman might have been sent to this institution, and might have been detained in this institution, through other means than the certificates of the two physicians, and there isn't anything, as a necessary conclusion, to be drawn from the acts of these physicians. While they might have surmised it, while they, doubtless, knew it was intended that these certificates were intended to be used by the husband of this woman, there isn't anything, as a necessary conclusion, in the signing of those certificates which necessarily convinced these two physicians either that the woman was to be sent to an institution, or that she was to be detained there for any particular length of time. We must, therefore, come down to the final discussion of this case within extremely narrow limits. And we say this: That unless there is testimony in this case which establishes the false and fraudulent character of these certificates as against these physicians, there cannot be any recovery against them, if this is all of the plaintiff's case, and if this is the conclusion of the plaintiff's case. There isn't anywhere, that the court knows of, where the certificate of a physician is presumed to be false until it is proven to be true, and there isn't anywhere any presumption that a person incarcerated in an institution is sane so that the detention in the institution has to be justified by the proof of insanity before there is testimony on the other hand. And the existing condition of affairs, provided it is justified by law, is presumed to be the correct condition of affairs, or the proper condition of affairs, until the contrary is shown.

Now, there isn't any testimony at all as to the mental condition of this plaintiff at the particular moment of time when she was produced, as she was produced, and as she admits she was produced, before each and both of these physicians. I should hesitate very much to say anything or do anything, that would induce any physician to view lightly or treat without consideration the subject of the issuing of a permit or the issuing of a certificate which was intended to deprive a man or a woman of his or her liberty. I know nothing that is more important, or that

is dearer to a human being, than his or her liberty. But, on the other hand, I should almost as much hesitate to say to a physician that you must whenever you are called upon to do a thing, be certain that you can guarantee success before you make an effort, because that, practically, would deprive humanity of the opportunity of enjoying the skill of physicians who would under those circumstances refrain from the exercise of their skill unless they could guarantee a cure. We all know that there are many instances when people ought to be put away, and where the opportunities of discovering the fact as to whether or not they ought to be put away are no more abundant than they were in this case, and it would be in a great many instances a very sad condition of affairs if physicians should refuse to give certificates because they were not sure that when they were brought into court for the purpose of giving some justification of that certificate they would succeed in justifying the giving of it. And, as I said before, there is a certain presumption in favor of the validity and of the correctness of certificates that are given under these circumstances by physicians who are reputable, and who are known, and who have, to say the least, the usual and ordinary skill which attaches to a man of their profession and to a practitioner who has been as long in the practice of medicine as these defendants have.

So that there should be something in this case to establish positively, not simply by a negative inference, but there ought to be something in this case to establish positively the fact that at the particular time when these particular certificates were issued these doctors knew or had some good reason to believe they were doing a false or fraudulent act.

Now, on the other hand, the testimony of Dr. Rennolds—properly in this case, unless the court was wrong in the ruling it made at that point—the testimony of Dr. Rennolds established a condition of affairs, which, to say the least, whether it justified a commitment or not—and the court is not going to express any opinion on that subject, certainly went to the extent of negativing any reasonable inference which this jury could draw from that testimony that the doctor had been negligent in his diagnosis, or having made a diagnosis had falsely and fraudulently misrepresented it.

So that whether it is related to the first count of the declaration as a matter of conspiracy, or whether it is related to the second count of the declaration, that I must confess that when you analyze the two of them and bring them down to their final essence there isn't after all a great deal of difference between the two counts—but whether you resolve it to one count or the other in the declaration, I cannot see that there is any testimony in this case that would justify this jury in saying, under the circumstances under which the doctor found himself in the presence of the plaintiff, with an opportunity of noting her actions and conduct, supported by what he had seen with his own eyes, an independent entirely of what he had heard from others, but what he had seen with his own eyes some days before that, I cannot see any grounds for any reasonable conclusion on the part of this jury that the doctor falsely and fraudulently and deliberately misrepresented this case, or misrepresented the condition of the plaintiff for the purpose and with the object of depriving her of her liberty.

Now, if the testimony in this case as to the condition of this plaintiff now and her actual condition during the time she was incarcerated in the institution, and what she says as to herself before the certificates were given, and before she was sent to the institution —if that is all true—then the gravest wrong has been perpetrated against the plaintiff. She knows who perpetrated it. But when it comes to the question as to whether or not a participation in that wrong has been so far established, in the opinion of the court, as against the defendants in this case, as to justify this court in letting a case of that kind go to the jury, the answer which the court gives, and the answer which it has undertaken to give the reasons for in the remarks I have just been addressing to you, is this: That there is no testimony in this case, legally sufficient, which would justify this jury in finding a verdict for the plaintiff as against these defendants, on the testimony which has already been offered in the case by the plaintiff, which, of course, is now concluded. And, therefore, the action of the court will be to grant the prayer, and instruct the jury

that under the instructions of the court they must find a verdict in favor of the defendants.